292 F.2d 775
 110 U.S.App.D.C. 282
 KONINKLIJKE LUCHTVAART MAATSCHAPPIJ N.V. KLM ROYAL DUTCH
AIRLINES HOLLAND, et al., appellants,
v.
Gertrude Owen TULLER, individually and as Executrix under
the will of William Gordon Tuller, deceased, et
al., Appellees.
 No. 15716.
 United States Court of Appeals District of Columbia Circuit.
 Argued Oct. 21, 196o.
Decided June 23, 1961.
 
 Mr. William J. Junkerman, New York City, for appellants.
 Mr. Murdaugh Stuart Madden, Washington, D.C., for appellees.
 Messrs. Theodore E. Wolcott and John S. Chapman, Jr., New York City, both of the Bar of the Supreme Court of the State of New York, were allowed to argue pro hac vice for appellees, but did not argue.
 Before Mr. Justice REED, retired,* and WILBUR K. MILLER, Chief Judge, and BURGER, Circuit Judge.
 BURGER, Circuit Judge.
 
 
 1
 This is an appeal from a $350,000 judgment for the appellees in an action for wrongful death. The decedent, William Gordon Tuller, was a passenger on a flight of Koninkijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airline Holland, (KLM), from Amsterdam to New York which crashed approximately one minute after take-off from its intermediate stop at Shannon, Ireland. The plane crashed in the tidewaters of the Shannon River some 7000 feet from the end of the airport runway. As the wheels of the plane left the ground, the control tower radioed its precise take-off time but the acknowledgement required to complete the take-off procedure was not forthcoming from the plane. Receiving no response, the tower made repeated attempts to mark radio contact, without success. SABENA (Societe Anonyme Belge d'Exploitation De La Navigation Aerienne), KLM's agent and flight representative at Shannon, had a radio capable of monitoring such messages. On this occasion the monitor was turned off immediately after the tower sent its part of the take-off message without awaiting the plane's response. As a consequence SABENA officials were not aware for some time of the failure of the KLM flight to answer. When the tower eventually notified SABENA of the loss of radio contact, SABENA did not advise Aer Lingus, KLM's operational representative, although it was SABENA's duty under its contract to inform Aer Lingus of probable interruptions of service or retarded progress of the flight 'as soon as possible.' In the KIM plane three radio microphones were available to the flight crew, the pilot, co-pilot and radio officer, and each micriphone was tuned to the tower frequency. Notwithstanding this, no distress message was transmitted either when the plane began to descend or after the crash. When the plane 'shuddered' in a stall the radio officer primarily charged with radio communications was thrown from his seat because he has failed to fasten his seat belt as required by operating regulations.
 
 
 2
 After the crash in shallow water, the crew evacuated most of the passengers to two rubber dinghies, which were moved along the side of the plane by means of ropes fastened to the fuselage. Tuller and another passenger made their escape through a rear window and stood on the tail of the airplane without life preservers. When their shouts were heard by the members of the crew in the second dimghy, the crew attempted to maneuver the dinghy around the wing. Finding the tow line too short, they cast off the line and attempted to paddle the dingly to the tail, but their efforts were unsuccessful due to tide and wind and the inadequate size of the paddles. Additional ropes were available in the cockpit but were not used. The ship's officers made no effort to determine the condition of the passengers on the tail of the plane of to ascertain whether they had life vests.
 
 
 3
 For over four hours Tuller and his companion remained on the tail in a rising tide. Near dawn, information of the crash and its location finally reached the tower, and a launch was dispatched to the crash scene. Just as the launch approached, with the water by then chest high, Tuller lost his footing and slipped into the water; his body was later recovered. His companion was rescued.
 
 
 4
 A booklet inserted in the back of each seat of the plane stated that life vests could be found in one of three locations in KLM planes, but at no time was the matter of life vests brought to the attention of the passengers nor had they been told the specific location of the vests in this airplane or how they should be fastened or inflated.
 
 
 5
 The jury was instructed that under the Warsaw Convention, which the court ruled governed the liability of the airlines, the damages were to be limited to $8300 unless the defendants were guilty of 'wilful misconduct,' in which case the $8300 limit did not control.[1] The jury returned a verdict for the plaintiff in the amount of $350,000.
 
 The appeal prsents these issues:
 
 6
 (1) Was there sufficient evidence of 'wilful misconduct' to go to the jury?
 
 
 7
 (2) Was there error in the reception in evidence of
 
 
 8
 (a) an Irish order pertaining to instruction on use and location of life vests,
 
 
 9
 (b) pages of a KLM manual relaing to ditching procedures,
 
 
 10
 (c) the contract between KLM and SABENA,
 
 
 11
 (d) a statement made by the radio operator at a hearing before Irish authorities some tweleve hours after the crash?
 
 
 12
 (3) Was there reversible error in the failure of the trial judge, absent request or objection, to clarify the impact of KLM's negligence on SABENA's liability?
 
 
 13
 (4) Was there sufficient evidence to support the damage award?
 
 Evidence of Wilful Misconduct
 
 14
 At the close of the case appellants moved to dismiss the complaint for all amounts in excess of $8300 and for a directed verdict in favor of appellees for $8300 for want of evidence of wilful misconduct under the terms of the Warsaw Convention. In considering whether the appellants were, as they claim, entitled to the relief they sought by their motion we are, of course, obliged to take that view of the evidence most favorable to appellees and give them the benefit of all inferences which might reasonably be drawn from the evidence. Gunning v. Cooley, 1930, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720.
 
 
 15
 On a motion for a directed verdict, '* * * it is well settled that the evidence must be construed most favorably to the plaintiff; to this end he is entitled to the full effect of every legitimate inference therefrom. If upon the evidence, so considered, reasonable men might differ, the case should go to the jury; if, on the other hand, no reasonable man could reach a verdict in favor of the plaintiff, the motion should be granted.' Jackson v. Capital Transit Co., 1938, 69 App.D.C. 147, 148, 99 F.2d 380, 381, certiorari denied, 1939 306 U.S. 630, 59 S.Ct. 464, 83 L.Ed. 1032, quoted in Kendall v. Gore Properties, Inc., 1956, 98 U.S.App.D.C. 378, 384 note 3, 236 F.2d 673, 679 note 3.
 
 
 16
 The jury was instructed that 'wilful misconduct is the intentional performance of an act with knowledge that the * * * act will probably result in injury or damage, or * * * in some manner as to imply reckless disregard of the consequences of its performance; and likewise, it also means * * * failure to act' in such circumstances. This was substantially the charge approved by this court in American Airlines, Inc. v. Ulen, 1949, 87 U.S.App.D.C. 307, 186 F.2d 529, where we also suggested that wilful misconduct means 'a deliberage purpose not to discharge some duty necessary to safety.' Id., 87 U.S.App.D.C. at page 311, 186 F.2d at page 533.
 
 
 17
 The phrase 'wilful missconduct' occasioned considerable discussion in the drafting of the Warsaw Convention in 1929. Liability was limited to 125,000 French france (then approximately $12,500-- and now approximately $8,300) for a single passenger unless Article 25 of the Convention applied. See note 1, supra. The United States was not a participant but in the discussions relating to the meaning of the French word 'dol' used in the text of Article 25 the English delegate said 'I wish it to be noted on the record that as a result of the explanations we translate these words as 'wilful misconduct,' a well-understood expression in our law.'[2]
 
 
 18
 The alleged wilful misconduct of the appellants in this case resolves itself into four elements: (1) failure to properly instruct passengers of the location of life vests and in their use; (2) failure to broadcast an emergency message; (3) failure to take steps to provide for the safety of Tuller after his peril was known; (4) failure of SABENA to be aware of the loss of radio communication with the plane and to initiate prompt search and rescue operations.
 
 
 19
 (1) The evidence showed that Tuller was alive within seconds before the rescue launch reached the airplane, but that he lost his footing, fell into the water, and was lost. Since the parties stipulated that Tuller was not injured in the crash, the jury could reasonably have inferred that if Tuller had been wearing a life vest his life could have been saved. Significantly, the crew members, who knew the location of life vests, realized the need and promptly put them on.
 
 
 20
 There was testimony that no announcements or instructions concerning life vests were made to passengers before take-offs or during flight, and the passenger who stood with Tuller on the tail testified that he did not know where the life vests were located. The descriptive booklets inserted in the back of each seat stated that the life vests could be found in one of three places, but at no time were the passengers informed where they could be found in this particular aircraft. Regulations of the Irish Government do not require life vest instructions unless a flight is more than 30 minutes travel from land. This flight was always within 30 minutes flight from land, provided it maintained normal flying speed-- and remained airborne, which of course it did not.
 
 
 21
 In view of the gravity of the harm which would follow an emergency landing on water on a night flight which contemplated landings and take-offs at at least two airports near the sea, the jury could reasonably find that the failure of KLM to establish and execute procedures to instruct passengers as to the location and use of life vests was a conscious and wilful omission to perform a positive duty and constituted reckless disregard of the consequences. We are not bound by the limits of the Irish Government's regulations as to when life vest instructions should be given to fulfill the duty of care owed to passengers. Cf. Horobin v. British Airways Corp. (1952) 2 A.E.R. 1016, 1019 (Q.B.).
 
 
 22
 (2) A distress message could have been sent merely by uttering the universal distress signal in the words 'King Yoke Mayday' or even 'Mayday.' Immediately before take-off the radio officer was at his desk in the plane with a microphone before him tuned to the tower frequency. But during the descent he was thrown to the floor because he had failed to take his seat and fasten his seat belt. The KLM operations manual required all personnel to have a 'conscious anticipation prior to takeoff of possible failure,' and to send a distress message as soon as an emergency arose.[3] Regulations of the Irish Government also required public transport aircraft to notify appropriate authorities 'by the quickest means available' of any accident involving the aircraft. The plane was equipped with radio microphones at three positions; the pilot's, the co-pilot's and the radio operator's. Here there was a brief period, even if only seconds, as to which a jury could reasonably find that the behavior of the plane gave notice of a possible crash and time sufficient to utter the distress signal. Furthermore, there was no attempt to send a message after the crash; there was evidence that the electrical system was so organized that the plane's radio would operate from independent power after the main ignition switch was thrown to avoid explosion and fire. In addition there was a portable emergency radio operable by hand crank in the rear of the plane.
 
 
 23
 Had a message been sent the control tower by any of the available means, the authorities would have been immediately aware of the crash and rescue equipment could have been dispatched promptly rather than some four hours later. Accordingly, the jury was warranted in concluding that KLM's agents, in failing to send a distress message, committed wilful misconduct.
 
 
 24
 (3) After the first dinghy was filled with passengers, the captain instructed the crewman in charge to take it to shore. The captain and radio officer made a final check for passengers in the cabin and then boarded the second dinghy. Shouts were heard from the passengers on the tail, and the crewmen attempted to maneuver the dinghy around the wing with the ropes attached to the fuselage. Finding the rope too short, and fearing to take the dinghy over the sharp edge of the wing, they released the rope and tried to paddle the dinghy. But the round rubber vessel would not respond to their small paddles and instead drifted with the tide toward the shore. The crewmen had no experience in the use of the dinghies except in a large swimming pool.
 
 
 25
 The crew was aware that it was possible to maneuver the dinghy by ropes attached to the fuselage because they had previously maneuvered it to the main door in that fashion. Moreover, additional lengths of rope sufficient to reach the tail were available in the cockpit. Various alternatives were plainly available: one of the crew could have swum to the tail of the plane with the rope and pulled the dinghy to the men or vice versa, as had been done with respect to moving the dinghy in earlier maneuvering. No effort was made to put a crew member on top of the cabin by use of ropes thrown, or carried by a swimmer, to the opposite wing engines. Had this been done the tail passengers might well have been guided over the top of the cabin to the dinghy. The jury could reasonably find that under these circumstances the failure to take available steps to provide for Tuller's safety was a conscious omission made with reckless disregard of the consequences when it was known he was in a position of peril. There is no suggestion that the departure of the second dinghy without making some effort to provide for Tuller's safety was necessary to protect the lives of the occupants of that dinghy.
 
 
 26
 (4) As agent for KLM, SABENA was charged by contract[4] with checking the progress of the flight and notifying Aer Lingus, the operational representative of KLM, in the case of retarded progress of the flight. However, as a result of the switching off of the SABENA monitor radio without waiting for completion of the take-off message and before it was known whether the airplane had failed to respond together with the absence of SABENA employees from the office at subsequent periods, Aer Lingus was not notified of the loss of communication for several hours, nor was the KLM station manager so notified.[5]
 
 
 27
 While the control tower personnel had broad duties with respect to contact with the plane and did in fact remain aware of the plane's failure to respond, SABENA as KLM's agent had contract duties as noted in the margin. But SABENA was seemingly satisfied with the loss of contact with the KLM plane at the critical moments of take-off, landings and take-offs being the most hazardous of their operations. In view of this it is less surprising that the tower personnel did not pursue the matter aggressively. The vital importance of communication between pilot and control tower is suggested by the severe governmental sanctions for failure to perform required acts of communication. The search and rescue organization of the Shannon airport did not have its own planes. As KLM's operational representative, Aer Lingus was the local facility capable of instituting a search. In recognition of this, the contract between KLM and SABENA, as we have noted, required SABENA to advise Aer Lingus immediately of any facts related to an interruption of service, and to keep Aer Lingus informed of the movements of the aircraft. Some forty-eight minutes after take-off, a SABENA agent learned from the control tower that radio contact with the plane had ceased shortly after take-off. Nevertheless, Aer Lingus was not notified of this fact for another hour and thirty minutes. Finally aware of loss of contact and the plane's failure to report a safe and completed take-off SABENA as KLM's representative had a duty to 'take action necessary for the safety of the flight' and press every available inquiry and to initiate through Aer Lingus emergency surface craft investigation in the area of the known take-off pattern.
 
 
 28
 Here no real effort was made to check on the'missing' plane until nearly two hours after take-off when the tower sighted flares in the take-off pattern of the KLM plane. Even then no surface craft were dispatched. Later another plane in routine flight sighted the crashed ship in the growing light of dawn and finally surface craft were dispatched. SABENA's failure to inform Aer Lingus of the loss of communication with the plane it was responsible for, plainly delayed emergency search and rescue action which, had it been initiated in these circumstances even as much as five minutes earlier, could have prevented Tuller's death. The defaults of SABENA as KLM's ground agent were conscious omissions of performance of positive duties relating directly to the safety of passengers.
 
 
 29
 We hold that as to each of the categories of alleged wilful misconduct of KLM there was sufficient evidence from which a jury could reasonably find that KLM was guilty of wilful misconduct as that term has been interpreted by this court under the Warsaw Convention; we hold also that there was sufficient evidence from which a jury could reasonably find that SABENA was guilty of wilful misconduct as that term has been interpreted by this court under the Warsaw Convention. There is also evidence from which a jury could reasonably find that as to each category of wilful misconduct the negligence in question contributed proximately to Tuller's death.
 
 
 30
 Alleged Errors in the Reception of Evidence
 
 
 31
 ( 1) Irish order as to life vests. Appellants' objections go solely to the interpretation put upon this order by appellees' counsel in argument to the jury. The applicability of the order was a fair subject of comment in argument and there is no substantial basis for disturbing the verdict on this ground.
 
 
 32
 ( 2) KLM manual. Pages of a KLM manual relating to the duties of the radio operator when there is a 'ditching' of the airplane were admitted over objection. The ground of the objection was that the manual applied only to planned and controlled emergency landing on water and not to an involuntary crash landing. As a result of questions by the appellees' counsel, and questions by the trial judge after impeachment of the witness by a prior deposition, a sufficient foundation was laid for the admission of this manual in evidence. The radio operator finally admitted that if a crash occurred it was the duty of the crew to carry out as many as possible of the planned ditching procedures.
 
 
 33
 ( 3) KLM-SABENA contract. It is urged as error that the contract between KLM and SABENA was not construed by the trial court and was the subject of argument in appellees' summation. Appellants did not request specific instructions on the meaning of the contract and made no objection after the charge; they are precluded from raising this objection now. Fed.R.Civ.P. 51, 28 U.S.C.
 
 
 34
 (4) Radio operator's statement. Appellees took the deposition of the KLM radio operator, Oudshorn, after his employment with KLM was terminated. In the deposition, which was received as part of the appellees' case in chief, the radio operator stated that he did not send a distress message before the plane crashed because there was not sufficient time to do so. He was then asked if he had made a statement to the Inspector of Accidents at the Shannon airport some hours after the crash. The witness admitted making statements at the hearing in question, which he said was attended by 'one of our chief flight engineers of KLM * * * one of the people of the Dutch CAA' and others. At this point appellees offered and the court received over objection a transcript of the radio operator's statement at the hearing before the Inspector of Accidents. Appellants objected to the proffered transcript of Oudshorn's statement on the ground that 'it is not part of the res gestae,' thus indicating that the statement was challenged as hearsay. After argument the District Court after first indicating that he regarded it as part of the res gestae, then reconsidered and ruled that
 
 
 35
 'The statement refers to the accident, otherwise there would be no purpose in having the statement made. It was made * * * at Shannon on the same (488) day of the accident and in response to the particular question as to why he didn't send the message.
 
 
 36
 'I think it is admissible and I will let it in.'
 
 
 37
 The pertinent part of the statement made by Oudshorn at that time was
 
 
 38
 'We were tuned at frequency of 118.7, the tower frequency, and I honestly must say that I did not think when it happened, to take the microphone and tell people there was something wrong on the plane. I could tell you that would never happen. You first think of your skin, and then of the microphone. That was my feeling, because it happened so fast.'
 
 
 39
 The trial judge did not try to limit the effect of this statement in any way. Realistically it could not have been admitted merely for purposes of impeachment in the circumstances shown here.[6] The challenged statement must be viewed as an important piece of substantive evidence on the issue of wilful misconduct. As such it disclosed an awareness of the existing risks and had a direct bearing on whether there was reckless disregard of the dangers to which the plane and its passengers were exposed.
 
 
 40
 Appellants argue that the challenged statement does not fall within any of the exceptions to the hearsay rule, pointing out particularly that the hearing at which it was made occurred 8 to 10 hours after the crash. We agree that the utterance was too remote in point of time from the event to sustain its admission as part of the res gestae. However spontaneous in the context of the hearing, it does not meet the standards of res gestae, in relation to the accident.
 
 
 41
 Appellees contend that Oudshorn's post-accident statement is admissible because it was made while he was an employee of KLM and was his explanation of his performance of duties within the scope of his employment. From this they urge that the utterance is imputable to KLM. In answer to this appellants contend that the radio operator was not a KLM employee when the deposition was taken or when the testimony was read into evidence at trial, and that the radio operator had no duty or authority to make declarations binding on KLM at the hearing of the Inspector of Accidents.
 
 
 42
 The radio operator was a KLM employee when he uttered the challenged statement. It is true that members of the flight crew of an airline are hired primarily to work for the airline, not to speak for it. But in this context, having in mind the public nature of the duties of a common carrier and the duties of crew members toward common carrier passengers, it was as much a part of the crew's duties to account to public authority for the manner in which those duties were discharged as it would be to account or report to the employer. Whether KLM acquiesced in the inquiry, or whether it had no choice in the matter is not entirely clear from the record; however the record discloses that a KLM representative was present at the hearing and that Oudshorn's statements were recorded without objection.
 
 
 43
 Many writers on evidence[7] have urged that rejecting early post-accident statements of an employee while receiving the employee's considered statements in the courtroom perhaps several years after the event is to give preference to the weaker over the stronger evidence. Had Oudshorn made substantially the same utterance within the hearing of a passenger as he emerged from the cabin of the plane we would permit the passenger to testify to what was said as part of the res gestae; yet the passenger's testimony might well come three or four years after the event and be dependent upon his recollection of the words uttered. That, surely, is not more reliable than Oudshorn's statement, against his interest, uttered and recorded some eight hours after the rescue, in a formal process of reporting to the Irish Government concerning the occurrence.
 
 
 44
 Apparently with this in mind the proposed Model Code of Evidence rule 508 (a) admits the employee's statement if 'the declaration concerned matter within the scope' of the declarant's employment. See also Slifka v. Johnson, 2 Cir., 161 F.2d 467, certiorari denied 1947, 332 U.S. 758, 68 S.Ct. 57, 92 L.Ed. 344; Martin v. Savage Truck Line, D.C.D.C.1954, 121 F.Supp. 417. Oudshorn's statement clearly concerned a matter within the scope of the radio operator's employment, since his compliance with undisputed safety regulations was in question.[8] Had he been at his assigned post with his microphone at hand and his instruments tuned to the tower frequency, as they were, he could have uttered the 'Mayday' distress signal in a fraction of a second. His explanation of his failure to do this was within the scope of his duties.
 
 
 45
 Since reliability is the basic test for the admission of any hearsay statement, the interest of the one who utters it and the one to be charged is always important. That this statement is adverse to the interest of KLM is plain. The statement was also adverse to Oudshorn's personal interests in that it entailed the possible loss of his employment, impairment of his future employment opportunities, possible civil liability for Tuller's death, and even the possibility of criminal sanctions. We think that such a recorded statement meets any reasonable test of reliability. The official nature of the inquiry which elicited the statement, the independent recording of the statement, the source of the utterance, and the interest of the utterer all combine to give the statement the earmarks of reliability absent in Palmer v. Hoffman, 1943, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645. Surely, it cannot be said, as to the employee who uttered it or the employer who is charged with it, that its 'primary utility is in litigating * * *.' Id., 318 U.S. at page 114, 63 S.Ct. at page 481. See Pekelis v. T.W.A., 2 Cir., 187 F.2d 122, 130, 23 A.L.R.2d 1349. Certiorari denied 1951, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374.
 
 
 46
 The Second Circuit considered the application of the federal shop book rule, 28 U.S.C. 1732 (1958) to a similar situation in Pekelis v. T.W.A., supra. There reports of an airline accident investigation conducted by the airline for its own purposes were held admissible. Noting that the challenged material was not favorable to the airline's interests, that court gave the interest factor significant weight in determining 'their earmarks of reliability' and in distinguishing Palmer v. Hoffman, supra. We need not reach the question whether the challenged statement here is admissible under the federal shop book rule in light of our holding that it is admissible on other grounds.
 
 
 47
 We emphasize that we are not here confronted with the problem of the admissibility of opinion evidence. See New York Life Ins. Co. v. Taylor, 1944, 79 U.S.App.D.C. 66, 147 F.2d 297; Washington Coca-Cola Bottling Works, Inc. v. Tawney, 1956, 98 U.S.App.D.C. 151, 233 F.2d 353. An added distinguishing factor is that KLM had full opportunity to cross-examine Oudshorn when the deposition was taken for the purposes of this case.
 
 
 48
 We are not unaware of the traditional arguments which can be advanced that exclusion of post-accident statements of this type may have value in that it tends to encourage free and full disclosure of information. See McCormick, Evidence 78, at 160-61 (1954). But the problem is one of balancing competing considerations and on balance we think the ends of justice are better served by receiving such statements when found to be reliable.
 
 
 49
 We hold that the statement made by Oudshorn, the KLM radio operator, as part of the authorized inquiry into to the causes of the crash and relating to his duties and acts within the scope of his employment was properly admitted in evidence.
 
 Alleged Errors in Instructions
 
 50
 Appellants' brief does not assert any errors in the trial court's instructions to the jury. However, it is contended that the trial judge precluded exceptions to the charge, and that error occurred in the charge with respect to the liability of SABENA. Appellants' supplemental memorandum suggests that the trial court failed to instruct correctly on the liability of SABENA in that the jury was told that a finding of wilful misconduct by either or both defendants would bring them to the issue of proximate cause. At no point did the court instruct the jury that if the wilful misconduct were committed solely by KLM, the principal, SABENA, the agent, could not be held liable. No such instruction was requested and no objection was taken to the charge in this respect. It should be noted that KLM and SABENA were represented by the same counsel, although obviously at this point their interests inevitably diverged. Rule 51 of the Fed.R.Civ.P. requires that objection be taken to errors in the charge in order to claim error on appeal. Some courts have taken the view that 'the 'plain error' rule may not be utilized in civil appeals to obtain a review of instructions given or refused, where the ground was not raised in the trial court.' Bertrand v. Southern Pac. Co., 9 Cir., 1960, 282 F.2d 569, 572, certiorari denied 1961, 365 U.S. 816, 81 S.Ct. 697, 5 L.Ed.2d 694.
 
 
 51
 Of course, if the trial court in fact prevented the objection from being made, an inviting case for the application of the 'plain error' rule would be presented. We have examined the portions of the record relied on by appellants to show that the District Judge in some way impeded or prevented the recording of a timely objection. We are satisfied that appellants had full and uninhibited opportunity to object to the charge concerning the liability of SABENA if they desired but failed to do so. The trial of this cause was long and expensive and the contentions underscore the need for strict compliance with the rule which treats as waived that to which no timely objection is made.
 
 
 52
 The claimed error in the scope of appellees' argument to the jury does not merit comment.
 
 Damages
 
 53
 The jury returned a verdict of $350,000 for the appellees. The evidence on the damage issue showed a life expectancy of 36 1/2 years. Tuller earned a salary of aproximately $27,000 or $20,000 a year after taxes as vice-president in charge of engineering at Melpar, a division of Westinghouse Airbrake.[9] Besides his widow, Tuller was survived by two children then aged four and eight respectively.
 
 
 54
 The award of $350,000 is attacked as so excessive that it should have been set aside by the District Court. We pointed out in Hulett v. Brinson, 1955, 97 U.S.App.D.C. 139, 142, 229 F.2d 22, 25, certiorari denied 1956, 350 U.S. 1014, 76 S.Ct. 659, 100 L.Ed. 874, 'that the rule in the Federal courts is that an appellate court may reverse, if at all, for excessiveness of verdict only where the verdict is so grossly excessive or monstrous as to demonstrate clearly that the trial court has abused its discretion in permitting it to stand.' See Affolder v. New York, C. & St. L.R. Co., 1950, 339 U.S. 96, 101, 70 S.Ct. 509, 94 L.Ed. 683. On the whole record we cannot say that the action of the District Judge who tried the case and heard the posttrial motions constitutes an abuse of discretion or that appellate action with respect to damages is required.
 
 
 55
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. 294(a)
 
 
 [1]
 The Warsaw Convention provides:
 '(1.) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.' Warsaw Convention, Art. 25, 49 Stat. 3020 (1934).
 
 
 [2]
 'We have in our country the expression 'wilful misconduct' * * * it covers not only acts accomplished with deliberation, but also acts of carelessness without regard of the consequences.' Proces-Verbaux II Conference Internationale de Droit Prive Aerien, 4-12 Octobre 1929, Varsovie, p. 40-42, published by the Ministry of Foreign Affairs of Poland, 1930. The declaration of adherence to the Convention as advised by the Senate was accompanied by an English translation which used the words 'wilful misconduct' to translate 'dol.' 49 Stat. 3020 (1934). This was the English translation before the Senate for consideration. 78 Cong.Rec. 11580 (1934). / 3/ The KLM operating manual, page 36, states:
 'Surface stations and ships should be informed of the existence of an emergency as soon as it arises. This should be done even if it is not certain that the airplane will have to be ditched. It is easy enough to cancel the call after the emergency is over.'
 
 
 [4]
 SABENA contracted to 'render * * * services to the Carrier's (KLM's) flight operating within the area of responsibility (at Shannon) as described in Paragraph 3 of this Annex thereby maintaining close liaison with the operational representative (Aer Lingus) designated by the Carrier so as to coordinate his requirements
 'Maintain contact with all flights within his area of responsibility noting advanced or retarded progress as compared with flight plan and inform the operational representative (Aer Lingus) designated by the Carrier.
 'In the event of an emergency, take action necessary for the safety of the flight being guided by the instructions in the relevant Operations Manual * * *.
 'Report the complete facts of any incident of a flight operations nature which causes delay or interruption of a flight to the operations department of the Carrier.
 'Ensure that probable or known interruptions to schedules for flight operational reasons * * * are given as soon as possible to the operational representatives designated by the Carrier.'
 
 
 [5]
 There was evidence that it was the established practice that a radio message was not regarded as complete until acknowledged by the recipient. The tower continued to request acknowledgment of its take-off message
 
 
 [6]
 Appellants' contention that the appellees improperly impeached their own witness, Oudshorn, is contradicted in appellants' own brief by the argument that:
 'The foregoing statement was actually not a contradiction of Oudshoorn's testimony that the accident happened so fast that there was not time to switch the frequencies in order to send out a message and that he did not think of doing so. The statement made some 12 hours after the accident that at the time of an airplane crash one thinks of one's skin before thinking of a microphone, was no more than a mental reaction at the time it was given-- it had no probative value other than to stir up passion, bias and prejudice on the part of the jury and that is exactly the way plaintiffs' counsel used it.'
 
 
 [7]
 See McCormick, Evidence, 244, at 519, (1954)
 
 
 [8]
 Oudshorn testified:
 'Q. Did every member of the flight crew have a seat with a seat belt? A. That's right.
 'q. What is the purpose of seat belts? A. Well, in case of an accident, or in sudden stop or acceleration, that you are not thrown out of your chair.
 'q. And you can continue your duties? A. That's right.
 'q. If you are not thrown out of your chair? A. That's right.
 'q. Is there any regulation requiring that these seat belts be fastened at any particular time? A. Yes, during take off and landing they are supposed to be fastened.
 'q. When you say 'during take off,' how much time does that encompass during take off? A. Well, that means from when you start off blocks until the Captain gives the command to switch off the sign 'Fasten seat belts.'
 'q. Did you feel at the time you felt this shudder, and when you were thrown out of your seat, (466) that the plane was going to crash? Did you have that sensation, that you were going to crash? A. I, personally, had that sensation when I felt this unusual shudder, and going down, that this was a crash. My personal opinion was that it was that.' / 9/ The appellees tendered but the District Court rejected proffered evidence purporting to show that Tuller's income would increase over the full span of life expectancy. Such evidence was relevant and should have been received. O'Connor v. United States, 2 Cir., 1959, 269 F.2d 578