**Alan M. HILL, et al., Plaintiffs,**

v.

**UNITED AIRLINES, Defendant.**

**Civ. A. No. 80–4049.**

United States District Court,
D. Kansas.

Oct. 27, 1982.

Edward G. Collister, Jr., Collister & Kampschroeder, Lawrence, Kan., for plaintiffs.

Roger J. Perry, J. Roger Hendrix, Marshall, Hawks, Hendrix, Schenk & Nichols, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter comes before the court on defendant's motion to determine controlling law and judgment thereon. Defendant has requested oral argument on its motion, however, after consideration of defendant's brief and exhibits, the statement of uncontroverted material facts and plaintiffs' response thereto, the court deems oral argument unnecessary to resolve the legal issues presented.

Plaintiffs' complaint against defendant alleges the tort of intentional misrepresentation. In this motion, defendant argues that the lawsuit is controlled by the terms of an international treaty known as the Warsaw Convention, which limits defendant's liability to a sum less than Ten Thou-

sand Dollars ($10,000) as to each plaintiff, and which also requires the court to dismiss this action because of improper venue.

In a light most favorable to the parties opposing the motion, the court finds that on October 13, 1979, plaintiffs Hill and Norris had reservations on United Airlines Flight No. 427, departing Kansas City International Airport at 8:25 a.m. and arriving in Denver, Colorado, at 8:50 a.m., and United Airlines Flight No. 387 departing Denver, Colorado, at 9:55 a.m. and arriving in Seattle, Washington, at 11:35 a.m., and Northwest Orient Flight No. 007, departing Seattle, Washington, at 1:40 p.m., to Tokyo, Japan.

After being airborne on Flight No. 427 from Kansas City, it was announced that the Denver-Seattle flight had been cancelled due to inclement weather in Seattle. Plaintiffs notified the flight attendants of their connecting flight from Seattle to Tokyo, Japan. After arriving in Denver, plaintiffs informed the United Airlines' ticket agent of their Tokyo flight. Plaintiffs were told that, because of inclement weather in Seattle, all flights into Seattle were cancelled. Plaintiffs were referred to United Airlines' front information desk, where they were told by the ticket agent that because of weather conditions in Seattle, all flights into and out of Seattle were, or soon would be, cancelled. He further assured plaintiffs that they could still make their connection because all flights were delayed due to Seattle's weather.

In Denver, United Airlines booked plaintiffs on a Denver-Portland-Seattle flight, which was scheduled to arrive in Seattle after plaintiffs' Tokyo flight was scheduled to depart. When plaintiffs asked why this flight could get into Seattle, but United Flight No. 387 could not, they were told that the flight from Portland to Seattle would probably be cancelled soon, but would be made when the Seattle airport was again opened.

After being airborne for approximately twenty minutes, it was announced that the Seattle airport was now open, and the flight would be arriving on time. Arriving on time, however, would mean that plaintiffs would miss their connection to Tokyo, Japan. Plaintiffs, being concerned about missing this connecting flight, informed the United Airline's agent in Portland, Oregon, of their problem. This agent also told plaintiffs of the inclement weather in Seattle. Plaintiffs thereupon called Northwest Orient Airlines, the connecting carrier in Seattle, who called the Director of Aviation in Seattle, and found that the Seattle airport had been open all morning. When confronted with this information, the United Airlines' agent in Portland said that Northwest Orient was wrong, and that the Seattle airport had been closed, but closed only to incoming traffic.

Plaintiffs finally arrived at Seattle, but learned that Northwest Orient Flight No. 007 for Tokyo had departed on schedule. When confronted, the United Airlines' agent in Seattle admitted that the airport had been open all morning, and that Flight No. 387 from Denver to Seattle had been cancelled because the "necessary equipment," presumably an airplane, was not in Denver. On October 13, 1979, the airport in Seattle had, in fact, been closed only from twelve o'clock midnight until four o'clock a.m.

Other carriers were available and were flying into Seattle. Plaintiffs did not depart from Kansas City until 8:25 a.m. on October 13, 1979. Defendant United Airlines itself could have rerouted plaintiffs on United Airlines Flight No. 999 departing Kansas City at 10:20 a.m. and arriving in Seattle at 11:45 a.m. Braniff Airlines had a flight departing Kansas City at 10:05 a.m. and arriving in Seattle at 11:35 a.m. Alternatively, had plaintiffs known that the Seattle airport was indeed open, they could have been rerouted in Denver on Continental Flight No. 453 departing Denver at 9:50 a.m. and arriving in Seattle at 11:18 a.m. None of these flights were cancelled. All of these flights would have arrived in Seattle in time for plaintiffs to make their connecting flight to Tokyo.

The manufacture of an Isowa Rotary Die Cutter, ultimately purchased by plaintiff Lawrence Paper Company, was delayed by

approximately one (1) month because plaintiffs Hill and Norris missed their Seattle-Tokyo flight. Plaintiff Norris claims actual damages in the sum of Nine Hundred Twenty-Five Dollars ($925). Plaintiff Hill claims actual damages in the amount of Four Hundred Forty-Seven and 50/100 Dollars ($447.50). Plaintiff Lawrence Paper Company claims actual damages in the amount of Six Thousand Seven Hundred Thirty and 50/100 Dollars ($6,730.50). All plaintiffs make a claim for punitive damages.

Defendant argues that the Warsaw Convention controls the respective parties' obligations and liabilities because of the international character of plaintiffs' trip. The Warsaw Convention, an international treaty dealing with international air transportation, was concluded in Warsaw, Poland, in 1929. The United States did not sign this treaty, but the United States became a party to the Warsaw Convention in 1934 by proclamation of the President of the United States, Franklin D. Roosevelt. *See* 49 Stat. § 3000, *et seq.* Liability in international air transportation is governed in large part by the rules promulgated in the Warsaw Convention. The Warsaw Convention by its terms expressly applies to international transportation by air. Article I, Subparagraph 2 of the Warsaw Convention defines "international transportation" as:

"... any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention..."

The airline transportation in this case concerned a trip from Kansas City, Missouri, to Tokyo, Japan; thus, this was international transportation under the terms of the Warsaw Convention. This is so because the United States has adopted the Convention, and Japan is a signatory party to the treaty, as is reflected by the signature of "His Majesty the Emperor of Japan." Both countries are "High Contracting Parties." On the face of things, therefore, the Warsaw Convention applies to this lawsuit.

Generally speaking, the Warsaw Convention limits an air carrier's liability to passengers for personal injury because of negligence to a certain designated sum of money. The Convention limits the liability of the carrier for each passenger to the sum of One Hundred Twenty-Five Thousand ($125,000) Francs, unless the carrier and passenger, by special contract, agree to a higher limit of liability, or unless it can be established that the carrier has been guilty of "willful misconduct." *See* Paragraph (1) of Articles 22 and 25 of the Warsaw Convention. *See also, Ross v. Pan American Airways,* 299 N.Y. 88, 85 N.E.2d 880, 13 A.L.R.2d 319, 335 (1949), Conway, J., dissenting.

Generally speaking, the Warsaw Convention prescribes the basic liability of a carrier in international air travel. Article 17 provides:

"The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger ... if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

Damages for delays are governed by Article 19 of the Warsaw Convention, which provides:

"The carrier shall be liable for damage occasioned by delay in the transportation by air of passengers, baggage, or goods."

The air carrier is protected to some extent by the terms of the Warsaw Convention. Article 20(1) provides:

"The carrier shall not be liable if he proves that he and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures."

Furthermore, an air carrier's liability is limited under the terms of the Warsaw Convention. Article 22(1) provides:

"In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs.... Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability."

The sum of One Hundred Twenty-Five Thousand ($125,000) Francs is equivalent to approximately Eight Thousand Three Hundred United States Dollars ($8,300). This dollar equivalent has prevailed since the 1933 devaluation of the dollar. Increasing dissatisfaction in the United States and by the United States government with the Warsaw Convention's liability limitation led to modification proposals in the Hague Conference of 1955. The Hague Conference resulted in agreement to extend the limit of liability to Sixteen Thousand Six Hundred Dollars ($16,600), exactly double the Warsaw Convention sum. The United States was apparently little satisfied with this extension, and for many years there was little effort in this country toward ratification of the Hague Protocol.

On November 15, 1965, the Johnson administration announced its decision to denounce the Warsaw Convention effective six (6) months later, on May 15, 1966. On the same date, the State Department issued a press release which indicated that unless the principle international airlines agreed to waive liability limits for death or wounding of passengers up to Seventy-Five Thousand Dollars ($75,000) per passenger, the United States would withdraw its denunciation of the Warsaw Convention. Under this prodding by the United States government, the International Civil Aviation Organization, of which the United States is a member, met in Montreal, Canada, in February, 1966, to work out a new liability limitation. The United States withdrew its denunciation, and, instead, approved, through the Civil Aeronautics Board, an interim agreement submitted by the Air Transportation Association, of which the defendant, United Air-

lines, is a member. This interim arrangement, known as Agreement C.A.B. 18900, provided that the parties thereto would agree to include in their tariffs to be filed with the Civil Aeronautics Board a "special contract" by which the carrier would waive its defenses provided by Article 20(1) of the Warsaw Convention, and also waive their limitation of liability under the Warsaw Convention for death or wounding of a passenger up to a sum of Seventy-Five Thousand Dollars ($75,000). *See,* generally, *Husserl v. Swiss Air Transport Co.,* 351 F.Supp. 702 (S.D.N.Y.1972), *aff'd.* 485 F.2d 1240 (2nd Cir.1973); *Dunn v. Trans World Airlines, Inc.,* 589 F.2d 408, 411 (9th Cir. 1978); *In re Air Crash in Bali, Indonesia,* 462 F.Supp. 1114, 1118–24 (C.D.Cal.1978).

Defendant contends that these and other portions of the Warsaw Convention apply to the instant litigation. We now turn to defendant's arguments.

### A

### VENUE & JURISDICTION

Defendant argues that the United States District Court for the District of Kansas is not the proper venue for this litigation and these parties. This argument is based on Article 28 of the Warsaw Convention, which provides:

"(1) An action for damages must be brought, at the option of the plaintiff, in the territory of one of the High Contracting Parties, either before the court of the domicile of the carrier or of his principal place of business, or where he has a place of business through which the contract has been made, or before the court at the place of destination.

"(2) Questions of procedure shall be governed by the law of the court to which the case is submitted."

Plaintiff alleges diversity is the basis for jurisdiction of the court pursuant to 28 U.S.C. § 1332. Defendant concedes that the residence of the respective parties is diverse; however, defendant contends that the proper statute conferring jurisdiction upon this court for a lawsuit arising under

a convention or treaty is 28 U.S.C. § 1331(a). The court is very familiar with this statute, and finds that it provides the court has "original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 ... and arises under the Constitution, laws, or treaties of the United States." This statute gives the court jurisdiction, and does not speak of venue.

Defendant next argues that Article 28 of the Warsaw Convention specifies the proper venue for any cause of action arising under the Warsaw Convention. As defendant reads Article 28, the plaintiffs have the option of bringing the suit in one of the contracting countries, either Japan or the United States. Next, defendant reads Article 28 as specifying the venue of the contracting states' courts: that is, either before a court of the carrier's domicile, or before a court where the carrier's principle place of business is located, or a place of business through which the contract was made. In the first instance, the carrier's domicile is Delaware; in the second instance, the carrier's principle place of business is Elk Grove, Illinois; and in the third instance, the place of business through which the contract was made is alleged to be Kansas City International Airport, Kansas City, Missouri.

■ The court finds two faults with this argument. First, the face of the ticket itself shows that it was issued through Ports Unlimited in Lawrence, Kansas. Therefore, we find that the place of business through which the contract was made is located within the District of Kansas, and that venue is arguably correct in this court.

Furthermore, unlike many of the countries of Europe, the United States has been subdivided into a multitude of small judicial districts for purposes of allocating territorial jurisdiction among the federal courts and among state and federal courts, and it is thus possible for one of the places designated in Article 28(1) to be within the territory of the United States, but nevertheless to be outside the jurisdiction of a particular American court in which the plaintiff is bringing his action. In recent cases, it has been held that Article 28(1) is not in any way concerned with the territorial subdivisions of the United States, but that an action is permissible in any American court under Article 28(1) so long as any one of the four places designated in the Article is located somewhere within the territory of the United States, even though outside the territorial jurisdiction of the specific court for which the action has been brought.

The leading case reflecting such is *Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851 (2nd Cir.1965), *cert. denied* 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965), *rehearing denied* 382 U.S. 933, 86 S.Ct. 307, 15 L.Ed.2d 345 (1965). In that case, it was pointed out that the plaintiff's choice of forum is restricted by Article 28(1) to a court within the territory of one of the High Contracting Parties to the extent that such territory is one of the four places enumerated in Article 28. Thereby disqualified, for example, is a forum in a country where an accident fortuitously occurred, or a forum in a country where the passenger was domiciled, or a forum in another country that had absolutely no contact with the flight, the carrier or the passenger. The court emphasized that Article 28(1) was written with reference to nation-states, not to areas and subdivisions within nation-states. The court noted that the minutes of negotiations surrounding the drafting of the Warsaw Convention did not reveal the slightest concern with problems relating to choice of forum within a nation-state. The court also noted that under a contrary interpretation, it would be difficult to determine the geographical boundaries of the four places designated in Article 28(1); that is, whether they would be cities, counties, states, judicial districts, judicial circuits, provinces or general geographical regions.

■ The *Mertens* case has gained wide acceptance, and it is now established that matters governed by the Warsaw Convention are subject to a dual concept of jurisdiction. On the first level, jurisdiction must be established in the international sense, that is, that the lawsuit is proper in a

particular country within the meaning of Article 28(1) of the Warsaw Convention. The second level of jurisdiction is the jurisdiction of the particular court selected by the plaintiff. The particular court selected by the plaintiff must have jurisdiction pursuant to applicable domestic law. *See, e.g., Butz v. British Airways,* 421 F.Supp. 127, 129 (E.D.Pa.1976). See also, *Smith v. Canadian Pacific Airways, Ltd.,* 452 F.2d 798 (2nd Cir.1971); *Vergara v. Aeroflot "Soviet Airlines",* 390 F.Supp. 1266 (D.Neb.1975); *Fabiano Shoe Co., Inc. v. Alitalia Airlines,* 380 F.Supp. 1400 (D.Mass.1974). Thus, we hold that the Warsaw Convention does not effect the court's jurisdiction or venue beyond affirming that this suit may properly be heard by a court located within the territorial limits of the United States. This is a lawsuit for an intentional tort arising under the common law of various states. It does not arise under the "Constitution, laws or treaties of the United States," and jurisdiction is therefore present because of diversity of citizenship between the respective parties. 28 U.S.C. §§ 1331(a) and 1332. Venue is proper in this court for this diversity case. 28 U.S.C. § 1391(a). Defendant's objection to venue will therefore be overruled.

### B

### LIABILITY UNDER THE WARSAW CONVENTION

■ The Warsaw Convention is a treaty, and thus it is the supreme law of the land. Being the supreme law of the land, it overrides and controls any conflicting state law. Defendant sees a conflict between the Warsaw Convention rules of liability and plaintiff's cause of action in this case for misrepresentation. Because of this conflict, defendant argues that plaintiff's cause of action fails and that plaintiff's right to damages, if any, must be found under the provisions of the Warsaw Convention itself.

■ The Warsaw Convention establishes a uniform system of liability rules to govern the fundamental aspects of international air transportation litigation. *Benjamins v.*

*British European Airways,* 572 F.2d 913, 917–18 (2nd Cir.1978), *cert. denied* 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); *Mahaney v. Air France,* 474 F.Supp. 532, 534 (S.D.N.Y.1979); *see also, Reed v. Wiser,* 555 F.2d 1079, 1092 (2nd Cir.1977), *cert. denied* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). The Warsaw Convention, however, is not a tariff or a contract: it does not exclusively regulate the relationship between passenger and carrier on an international flight. *Husserl v. Swiss Air Transport Co.,* 351 F.Supp. 702, 706 (S.D.N.Y. 1972), *aff'd.* 485 F.2d 1240 (2nd Cir.1973). If the convention applies, it is a treaty, and therefore preempts local law which conflicts with the convention. U.S. Constitution, Article VI. However, if the Warsaw Convention applies, it applies to limit, not eliminate, liability; and if it does not apply, it leaves liability to be established to traditional common law rules. *Husserl v. Swiss Air Transport Co., supra,* at 706.

■ Defendant argues that the cause of action of plaintiffs Hill and Norris must be dismissed unless it arises under one article of the Warsaw Convention. However, the above-cited cases demonstrate that this is not a requirement or prerequisite to stating the cause of action. Plaintiffs Hill and Norris complain of defendant's alleged misrepresentation, they do not complain of death or wounding as a result of an accident pursuant to Article 17, they do not claim damages in the event of destruction or loss of their baggage pursuant to Article 18, and they do not make a claim for damages occasioned by delay in the transportation of themselves or their baggage pursuant to Article 19. Therefore, these articles are irrelevant to the issues presented by plaintiffs Hill and Norris' cause of action for an intentional tort. Liability, if any, is predicated on defendant's commission of the tort of misrepresentation, a circumstance completely outside of the Warsaw Convention. We find nothing in the Warsaw Convention to bar a lawsuit for damages as a result of the alleged intentional tort. *See Mahaney v. Air France, supra,* 474 F.Supp. 532, 534–36.

■ Defendant argues that Lawrence Paper Company's damages, if any, are so remote that as a matter of law they were not occasioned by the delay of plaintiffs Hill and Norris. Defendant points out that plaintiffs cannot prove that they were guaranteed shipment, delivery, installation and operation of the Isowa Rotary Die Cutter on any date, only that they were promised a manufacturing completion date. Plaintiffs point out that the freighter transporting the machine could have sunk, the transcontinental shipper could have crashed, the plaintiff could have incurred installation problems—all of these might have occurred in one form or another to cause plaintiff some sort of operational delay and possible loss of income. Defendant points out that these are contingent consequences as remote as plaintiff Lawrence Paper Company's claim. On the question of whether or not Lawrence Paper Company's damages are too remote as a matter of law, the court will deny defendant's motion for summary judgment at this time, without prejudice, so that the motion may be renewed again after the court has had the benefit of hearing plaintiff Lawrence Paper Company's evidence of damage.

## C

### PUNITIVE DAMAGES

Defendant argues that plaintiffs' entitlement to punitive damages, if any, is addressed by Article 25(1), which provides that:

> "The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, *if the damage is caused by his wilful misconduct* or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct." (Emphasis supplied.)

Plaintiffs take the position that their allegation of the intentional tort of misrepresentation is equivalent to "willful misconduct" as that term is used in the Warsaw Convention. Defendant takes the position that the term "willful misconduct" was in-

tended by the drafters of the Warsaw Convention to mean something more like the tort of outrage. Defendant's position is derived from the literal translation of the original Warsaw Convention, which is written in French.

■ By the express terms of the Warsaw Convention, an air carrier is not entitled to avail himself of the limitation provisions of the Warsaw Convention for injury or damage caused by its willful misconduct. By express terms of the Convention, willful misconduct is defined in accordance with the law of the court to which the case is submitted. *Koninklijke Luchtvaart Maatschappij N.V. KLM Royal Dutch Airlines Holland v. Tuller,* 292 F.2d 775, 778 (D.C. Cir.1961) [hereinafter cited as *KLM v. Tuller*], *cert. denied* 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *American Airlines, Inc. v. Ulen,* 186 F.2d 529 (D.C.Cir.1949). We have examined defendant's argument, and the authorities cited in support thereof, and find that plaintiffs have nonetheless invoked the "willful misconduct" exception to defendant's limitations of liability under the Warsaw Convention.

The issue before the court is whether the term "willful misconduct" is broad enough to encompass plaintiffs' allegations of intentional misrepresentations. We have examined the case law developed under Article 25 of the Warsaw Convention, and find that the term "willful misconduct" has not been given the restrictive interpretation urged by defendant.

For example, in *KLM v. Tuller, supra,* the Circuit Court of Appeals for the District of Columbia approved the jury instruction that "willful misconduct is the intentional performance of an act with the knowledge that the . . . act will properly result in injury or damage or . . . in some manner as to imply reckless disregard of the consequences of its performance; and likewise, it also means . . . failure to act." *Id.* at 778. That case involved wrongful conduct on the part of the defendant airlines in failing to instruct their passengers adequately on the location and use of personal flotation equip-

ment, and the failure of the flight crew to notify the control tower that the aircraft had crashed into the ocean some seven thousand feet (7,000′) from the end of the runway.

In *Pekelis v. Transcontinental & Western Air, Inc.,* 187 F.2d 122, 124–25 (2nd Cir. 1951), the court approved a willful misconduct instruction to the jury in a case where the evidence showed that one of the defendant's mechanics intentionally omitted to perform a necessary safety check.

In *American Airlines v. Ulen, supra,* the Court of Appeals for the District of Columbia rejected as "baseless" a defendant's argument virtually identical to the argument made in this case, that the original French language of the convention has been improperly translated. Defendant in that case argued that an air carrier must be guilty of "well nigh criminal intent" before Article 25(1) has application. The court of appeals rejected that argument and approved a jury instruction concerning willful misconduct in a case where the evidence showed that defendant's pilot had intentionally plotted a course of flight which would pass dangerously close to a four thousand foot (4,000′) mountain peak. The aircraft in that case crashed into the mountain peak resulting in the death or serious injury of the crew and many passengers.

The court finds that willful misconduct is a question of fact [*In re Pago Pago Aircrash of January 30, 1974,* 419 F.Supp. 1158, 1160 (C.D.Cal.1976)], and that the willful misconduct issue is properly before the court where it is alleged, as it is here, that the defendant willfully performed an act or acts with the knowledge that the performance of those acts was likely to result in injury or damage, or that those acts were performed with reckless disregard of their probable consequences. *Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532, 537 (2nd Cir.1965).

### D

### CONCLUSION

The court finds that plaintiffs' case should not be dismissed for improper venue.

The court further finds that defendant's motion for summary judgment as to the claims for damage of Lawrence Paper Company should be denied at this time, without prejudice, so that the court might have benefit of a full presentation of Lawrence Paper Company's case. Finally, the court finds that while the Warsaw Convention is basically the controlling law in this case, plaintiffs have properly invoked the provisions of Article 25(1), which make an exception to defendant's limited liability and might entitle plaintiffs to recover actual and punitive damages in a sum exceeding Ten Thousand Dollars ($10,000) if they prove the elements of intentional misrepresentation. Therefore, this case should not be dismissed for failure of plaintiffs to meet the jurisdictional threshold of $10,000 as set out in 28 U.S.C. § 1331(a).

IT IS BY THE COURT THEREFORE ORDERED that defendant's motion to determine controlling law and judgment thereon is hereby overruled.