Stanley G. **MARKUSEN**, Plaintiff,

v.

**GENERAL ANILINE & FILM CORPORATION**, Defendant.

United States District Court,
S. D. New York.

Dec. 9, 1954.

Klein, Wikler & Gottlieb, New York City, for plaintiff. Nathan H. Elman, of counsel.

Herbert L. Abrons, New York City, for defendant.

IRVING R. KAUFMAN, District Judge.

The defendant moves for judgment notwithstanding the verdict and in the alternative for a new trial. The plaintiff sued upon an alleged oral agreement to recover so-called severance pay amounting to $5,500 plus certain designated expenses amounting to $1,500.

With regard to the motion for judgment n. o. v., the sole question before me is whether as a matter of law there was sufficient evidence from which the jury could conclude that the contract as alleged in the complaint was made. The defendant sums up its position in the following manner: "Defendant's contention is—not that the contract was too indefinite—but that there was no proof of any contract at all." (p. 2, defendant's brief).

Upon this application the evidence must be construed most favorably to the plaintiff and if reasonable and fair-minded men properly instructed on the law could find a verdict in plaintiff's favor, the verdict cannot be upset. Bell v. Brown, 1942, 76 U.S.App.D.C. 5, 128 F.2d 317; Tiller v. Atlantic Coast Line R. Co., 1943, 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610; Stueber v. Admiral Corp., 7 Cir., 1949, 171 F.2d 777, 779; See 5 Moore, Federal Practice, 2314–20.

It is noted that the interpretation of the applicable contract law applied by the Court in its charge was not excepted to by either party to this litigation nor were there any requests for additional charges. Starting from this point, it is reiterated that if the Court properly instructed the jury on the law, all that is required is to examine the record in order to determine whether there is a complete absence of any evidence in the record to support plaintiff's claim. An examination of the record with this in mind impels the conclusion that there is adequate evidence in the record to sustain the verdict of the jury and specifically the jury's inherent finding that there was a contract. That the issues and the applicable law concerning the making of a valid contract were squarely submitted

to the jury cannot be doubted as the footnoted excerpts indicate.[1] The plaintiff's testimony, if believed by the jury, was ample to sustain the alleged agreement for the payment of $5,500 severance pay and expenses of $1,500. A reading of a portion of Markusen's testimony, dispels doubt on this score.[2]

In summary, it may be said that the propositions now urged by the defendant

[1] "The sole issue for you to decide here is whether the parties made any agreement for the payment of a severance salary and moving expenses, and if you find that no such oral agreement was made, then your verdict must be for the defendant, and both parties here—and if I am in error I want to be corrected—agree that your verdict in this case can be only for the total amount, $7,000 or nothing; there can't be any compromise verdict in this case.

"If you find that the defendant, through Mr. Frye, did make statements to the plaintiff that six months' salary would be paid in December, 1950, made those statements when he was agreeing to hire him, in which he said that six months' salary would be paid, and, in addition, his moving expenses from France to New York City in the sum of $1,500—that that would be paid, then I charge you that you will ask yourselves whether such an agreement has been made, and in doing so I want to tell you that the agreement need not have been stated in any set form of words for you to find that there was an express oral contract as the plaintiff claims, but although no particular set of words is necessary in order to find for the plaintiff, you must find, from all the circumstances that reasonable men would have understood, that the parties had made the precise terms which the plaintiff now says were made; that is, that Frye agreed, on behalf of the company, that if the plaintiff was severed at any time for any reason, he would receive the severance salary of $5,500 plus the $1,500 expenses.

\* \* \* \* \* \*

"If you find that the language used by the parties with respect to the agreement or the alleged agreement was too indefinite, uncertain or unclear to convey a definite meaning to reasonable and prudent businessmen, it could not result in a binding contract.

"You must not speculate as to what the parties intended; that you cannot do. You must find that the words used in this instance were such that a prudent and reasonable businessman would believe that an agreement as to terms and conditions had been made, and if you cannot determine with reasonable certainty what the parties intended, that is, that what they had said was very loose and very vague and it did not amount to a binding agreement but was merely a discussion of what they intended to do in the future, then there was no agreement.

"It is a necessary requirement in the nature of things that an agreement, in order to be binding, must be sufficiently definite to enable you to give it meaning, and if you cannot give the alleged contract a meaning, in that event your verdict must be for the defendant.

"If you believe that Mr. Frye made some statements at the time of the hiring in December, 1950, and if what he said at that time was a mere expression of what he intended to do in the future, in short, that he would at some future time enter into some agreement with the plaintiff to compensate him, as the plaintiff says he was to be compensated, then it would appear that at that time, if that is the fact, there was no binding agreement made but that there was something left to be done in the future."

[2] "Q. Did you then begin to discuss a position for yourself? A. Yes, I did. At the meeting when I called to see Mr. Frye at his office at 230 Park Avenue, we discussed briefly Mr. Morgan. I disclosed to him certain things, and Mr. Frye and I both agreed that he was probably not the man that Mr. Frye wanted.

"Then Mr. Frye asked me if I was interested in coming in at this time. I said I was. I said that the job and the outline of the duties that we had discussed the previous night and that day interested me. I was interested in coming back to New York.

"I thought that due to my contacts and experiences in Europe, and having met a large number of newspapermen, columnists, editors and so forth, I could get that story across for him and for the management, and it sounds like a challenging job.

"He then asked me if I would go in and have a chat with Mr. Hyland. I said 'Yes, I will be glad to do so.'

"So I had a conversation and brief talk with Mr. Hyland, who was director of public relations. We chatted very briefly. It was a bit of a strained atmosphere because I had never met Mr. Hyland and Mr. Hyland had never met me.

"I introduced myself to him, who I was, that there was a possibility I might

for judgment n.o.v. or for a new trial were in substance urged at the trial. The propositions were incorporated into the Court's charge and squarely submitted to the jury. The jury was asked to decide whether there had been an agreement entered into, and had been instructed that:

(1) if the language used by the parties was too indefinite, uncertain or unclear, no binding contract could result;

(2) it could not speculate as to what the parties intended. It had to find from the words used that prudent business men would believe that an agreement as to terms and conditions as alleged had been made;

(3) if the terms were very loose and very vague, then it did not amount to a binding agreement but would constitute merely a discussion of what was intend-

be coming to join General Aniline and Film. I described what I had been doing in TWA over in Paris and so forth, and we had a rather brief, friendly meeting, and then both Mr. Hyland and I went in to Mr. Frye.

"Mr. Frye then told both of us that I would be considered as a good possibility, he was thinking of hiring me to come in and do a public relations job for him and for the company, and that if I were hired, I would work directly for Mr. Frye and that I would keep Mr. Hyland informed of what it was I would do, but my responsibility would be to Mr. Frye.

"A. Still Mr. Hyland nodded and there wasn't too much more said when Mr. Hyland was there, and Mr. Hyland left the room.

"Then Mr. Frye said to me, 'Well, Stan, how about coming in, then? What do you think, if you come in, would be a fair salary?'

"So I said, 'Well, I don't know exactly, Mr. Frye. I have a certain job and responsibility over in Paris with TWA. I don't like to leave it unless this is a very good opportunity.'

"I said, 'I am going to be very frank with you. Mr. Hyland is an older man. I think it is going to be a little bit embarrassing. He is your director of public relations.'

"And then Mr. Frye said, 'Well, that is all right, he is a director of public relations now, but I have a spot for him now and I am going to promote him when that opportunity comes up. And you come in here and I will see that you become director of public relations within a reasonably short period of time.'

"So I said, 'Under that situation that seems all right. How about salary?'

"He said, 'How about $11,000 a year?'

"And I said, 'Well, that isn't too much more than I am getting with TWA, and, of course'—

*     *     *     *     *     *

"A. Mr. Frye then said that he would

pay me $11,000 and as I worked in the corporation, naturally, my salary would be adjusted upwards. 'As you have outlined this job, Mr. Frye, it is a job which is going to require a large amount of entertaining.

"'I have got to contact leading columnists around town, financial editors and others, and put over a management record, and the way I visualize doing that job I will rent a large apartment and I will do a judicious amount of entertaining and it will require some expenses.'

"Well, he said, 'On the matter of expenses we can adjust that. I realize that you have certain entertainment to do, and to get into contact with the writers that you want to sell our particular record on.'

"Then I said, 'Well, I am still a little concerned about the fact of Mr. Hyland being in here as a director of public relations. Do you think that is going to be a welcome thing to him?'

"'Well', he said, 'Stan, it is not going to be easy, but', he said, 'I will tell you what. If this thing does not work out and I have to let you go, I would see that you get at least six months' salary, that would be $5,500, and I could take care of your moving expenses over from Paris.'

"So I said, 'That should be about $2,500 because I have an apartment. I have rented it for six months until the end of March.'

"He said, 'That's a little high, but I will offer you $1,500.'

"'But', he said, 'you can have that and keep that in the back of your mind. I don't want you to worry about finances when you come in here, because we have got a big job to do.'

"I said, 'Mr. Frye, on the strength of that I am perfectly willing to come in here, and I think that I can do the job for you. I have got the experience; I have got the contacts, and I will go in and fight hard and do everything I can starting the first of the year.'"

ed to be done by the parties in the future;

(4) an agreement in order to be binding must be sufficiently definite to have meaning, and if it cannot be given meaning then there cannot be an agreement.

■ The issue was sharply drawn between the plaintiff Markusen and the defendant through its president, Mr. Frye. The jury undoubtedly gave credence to the plaintiff's version and believed that the contract as alleged had been made. Defendant, through this motion, would have the Court usurp the jury's function. This it cannot do. The motion for judgment n.o.v. is denied.

■■ The motion for a new trial on the ground, inter alia, that the verdict is against the weight of the evidence is addressed to the Court's discretion. See 6 Moore, Federal Practice, 3814–21. The trial judge cannot set aside a verdict merely because, if he were a juror, he would have reached a different result. In the instant case, as the preceding discussion indicates, the verdict was clearly not against the weight of the evidence. Accordingly, the motion for a new trial is denied in all respects.