346 F.2d 532
 T. Roland BERNER and Arthur S. Lesser, Executors of the
Estate of William Kapell, deceased,
Plaintiffs-Appellants-Appellees,
v.
BRITISH COMMONWEALTH PACIFIC AIRLINES, LTD., a Foreign Corp.
and BritishCommonwealth Pacific Airlines, Ltd., now doing
business as Qantas EmpireAviation Ltd., a Foreign
Corporation, Defendants-Appellees-Appellants.
 No. 200, Docket 29033.
 United States Court of Appeals Second Circuit.
 Argued Dec. 7, 1964.
Decided June 9, 1965.
 
 M. Victor Leventritt, New York City (T. Roland Berner, New York City, on the brief; Aaron Lewittes, Sidney Bender, New York City, of counsel), for plaintiffs-appellants-appellees.
 Austin P. Magner, New York City (Condon & Forsyth, New York City, on the brief; George N. Tompkins, Jr., New York City, of counsel), for defendants-appellees-appellants.
 Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 This is a diversity action for damages for wrongful death arising out of an airplane accident on October 29, 1953. In 1953 a pilot for defendant British Commonwealth Pacific Airlines, Ltd. (BCPA), an Australian corporation, in a plane coming from Honolulu, began an instrument landing, during which operation it crashed against a mountain near the San Francisco, California, airport. All aboard were killed, including plaintiffs' deceased, the noted pianist William Kapell.
 
 
 2
 The flight having been international, BCPA and defendant Qantas Empire Aviation, Ltd. (Qantas) claimed that liability was limited by the Warsaw Convention,[1] under which plaintiffs could recover no more than $8,291.87, unless BCPA had been guilty of 'wilful misconduct.'[2] If, on the other hand, BCPA had taken all necessary means to avoid the accident, or if that were impossible, then BCPA would not be liable to plaintiffs for any amount.[3]
 
 
 3
 After a jury trial in 1961 before Judge Willis Ritter, the jury found for defendants on all issues; no damages were awarded. Plaintiffs moves for judgment notwithstanding the verdict or for a new trial, and two years later Judge Ritter granted judgment for plaintiff as to liability, ordering a new trial only as to damages. He also ordered a conditional new trial on all issues if the judgment n.o.v. were reversed on appeal. 219 F.Supp. 289 (S.D.N.Y.1963). Defendants object to both determinations.
 
 
 4
 After a trial in 1964 before Judge McLean a jury found damages of $924,396. Plaintiff moved for the addition of prejudgment interest from date of death-- 1953-- to date of judgment. The motion was denied, 230 F.Supp. 240 (S.D.N.Y.1964), and plaintiffs appeal.
 
 The Pleadings
 
 5
 As a first cause of action against BCPA, the complaint alleged in substance that the crash 'was caused solely by the wilful misconduct of defendant BCPA, its agents and employees, in and about the management, operation, control and maintenance of the aforesaid airplane, * * *.' Other causes of action alleged negligence on the part of BCPA. These causes of action were repeated against BCPA 'now doing business as Qantas Empire Aviation, Ltd.' on the theory that Qantas became a successor in interest to, and assumed the obligations of, BCPA. British Overseas Airways Corp. (BOAC) was made a defendant in two causes of action on the theory that BOAC was negligent in choosing BCPA as the air carrier to transport Kapell. Except for certain factual admissions not in dispute, BCPA (and BCPA d/b/a Qantas), denied liability generally although admitting that in its liquidation it had transferred only certain assets to Qantas. For an affirmative defense BCPA (and Qantas) alleged that the flight was in 'international transportation' and that the 'Convention for the Unification of Certain Rules Relating to International Transportation by Air and Additional Protocol,' referred to herein as the 'Warsaw Convention' or 'Convention,' limited its liability to each passenger to 125,000 francs ($8,291.87).
 
 The Trial
 
 6
 The trial before a jury consumed thirteen days. Some thirty-seven witnesses testified in person or by deposition. Their testimony covered a range from technical airplane piloting and landing procedures, the rules and regulations pertaining thereto, weather conditions, the sound of the plane and the crash, to Kapell's then and future earning capacity.
 
 
 7
 At the conclusion of plaintiffs' case, Qantas moved for a directed verdict, which motion was denied. Decision was reserved until after verdict on a similar motion at the end of the entire case. The many issues of fact were submitted to the jury in a lengthy charge. The jury returned a verdict 'Unanimous for the defendant.'
 
 
 8
 The Charge.
 
 
 9
 The trial court first expounded its views of the effect of the Warsaw Convention. After mentioning the limited damages aspect of the Convention, the Court charged, 'If what the pilot or crew did, or failed to do, was 'wilful misconduct,' there are no limits imposed by the Warsaw Convention upon the damages that may be recovered.' The court then proceeded in a charge most favorable to plaintiff to define 'wilful misconduct' as it might be found in a series of hypothetical situations in the operation of the airplane while attempting to land, including the comment that 'it may be that a jury would feel justified in coming to the conclusion that some relatively minor breach of a safety regulation amounts to 'wilful misconduct,' although it would not do so in places and on occasions when the consequences of such an approach would be much less serious.'
 
 
 10
 The jury were told that it was their function not only to take into consideration 'all of the facts and circumstances in proof' but also all the inferences fairly and reasonably to be drawn from the facts as proven. Even on the question of the pilot's knowledge in the definition of 'wilful misconduct' the jury were instructed that proof thereof did not have to be by direct evidence but that they had 'a right to infer that the pilot or flight crew in charge of the aircraft had such knowledge or would have had such knowledge.' As the court finally summarized the case, in addition to weighing the evidence, the circumstantial evidence and all inferences therefrom, the jury were to hold the defendants 'liable to the plaintiffs for the damages caused by that death without limitation' if the defendant 'knowingly and intentionally violated any of the Civil Air Regulations or the landing instructions from the San Francisco Approach Control Tower.' The jury was to apply the law 'to the facts which you may find have been established in this case.'
 
 
 11
 The jury acting upon these instructions found for the defendant. Over two years later the court, upon the same proof as had been submitted to the jury for their resolution of the facts, directed judgment n.o.v. in favor of plaintiffs and ordered a new trial on the issues of damages only.
 
 The Court's Opinion
 
 12
 In a lengthy opinion, the court reviewed its version of the facts and by granting plaintiffs' motions, in effect, substituted itself for the jury and drew its own inferences from the facts.
 
 
 13
 Some twenty printed pages are given to an analysis of the Warsaw Convention. Reference is made to various comments of German, British, Luxembourg, Italian, French, Brazilian and Swiss delegates to the Warsaw Conference with respect to 'dolus,' 'dol,' and 'faute lourde' and the translation of these words into our law as 'wilful misconduct' (a phrase accepted and used by the court in its jury charge). However, the impression is gained from the opinion that to the court 'the Warsaw Convention was a device by which to subsidize the then infant industry of international air transportation' and that 'it is a strange concept to us in the United States that the subsidy should be taken out of the widows and orphans of the passengers.' 219 F.Supp. at 322-323.
 
 The Interlocutory Judgment
 
 14
 The court not only directed a judgment against defendant 'on the issue of liability' but also, in the alternative, ordered a new trial on all issues 'if the judgment non obstante veredicto is set aside on appeal.'
 
 The Primary Appellate Issue
 
 15
 The primary issue to be resolved upon this appeal is whether the trial court was justified in setting aside the jury's verdict in favor of defendant and, assuming the jury's role as fact finder, granting judgment to plaintiffs.
 
 
 16
 The separate roles to be played by the jury with respect to the facts and by the court with respect to the law have been rather firmly settled for many generations. As the Supreme Court said in Tennant v. Peoria & Pekin Union Ry., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944):
 
 
 17
 'It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. (citing cases) That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.'
 
 
 18
 This admonition was re-emphasized in Lavender v. Jurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946):
 
 
 19
 'It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.'
 
 
 20
 No useful purpose will be served by even a resume of the many factual issues outlined in the court's charge or raised by the testimony set forth in great detail in the opinion of 86 pages. Suffice it to say that the trial court presented the factual issues to the jury in the charge, giving to them the broadest leeway to draw such inferences as to wilful misconduct as might be warranted. They obviously resolved the facts and inferences therefrom as not supporting wilful misconduct.
 
 
 21
 I. 'Wilful misconduct' as a Matter of Law.
 
 
 22
 In granting plaintiffs' motion for judgment n.o.v., Judge Ritter held that the evidence established 'wilful misconduct' as a matter of law; i.e., that the only conclusion a reasonable jury could have reached was that the defendants were guilty of wilful misconduct. See, e.g., Wilkerson v. McCarthy, 336 U.S. 53, 62-63, 69 S.Ct. 413, 93 L.Ed. 497 (1949); Marsh v. Illinois Cent. R.R., 175 F.2d 498, 500 (5th Cir. 1949); Blum v. Fresh Grown Preserve Corp., 292 N.Y. 241, 245-246, 54 N.E.2d 809, 810 (1944).
 
 
 23
 A. The applicable standard of wilful misconduct.
 
 
 24
 1. As stated by prior decisions. Although it is immaterial to the jury's resolution of the facts, the court in its opinion was in error in concluding that the Second Circuit does not require knowledge that damage would probably result. The charge of the trial court in Pekelis v. Transcontinental & W. Air, Inc., upheld by this court in 187 F.2d 122, 124 (2 Cir.), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951), and referred to by the trial court in the present case, was that:
 
 
 25
 'wilful misconduct is the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage, or it may be the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences * * *, (or) the intentional omission of some act, with knowledge that such omission will probably result in damage or injury, or the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission * * *.'
 
 
 26
 We held that an instruction requested by the plaintiff in that case was properly denied
 
 
 27
 'because it failed to state that the employee must either have known that * * * (test) was necessary for safety, or his duty to make it must have been so obvious that in failing to make it his conduct would be reckless, rather than merely negligent.'* (Id. at 125.)
 
 
 28
 Then, in Grey v. American Airlines, Inc., 227 F.2d 282, 285 (2d Cir. 1955), cert. denied, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956), Judge Medina 'in accordance with precedent' approved a charge requiring 'proof of 'a conscious intent to do or omit doing an act from which harm results to another, or an intentional omission of a manifest duty. There must be a realization of the probability of injury from the conduct, and a disregard of the probable consequences of such conduct." To like effect was the charge upheld in American Airlines, Inc. v. Ulen, 87 U.S.App.D.C. 307, 311, 186 F.2d 529, 533 (1949), which said that it would be wilful misconduct if the carrier
 
 
 29
 'wilfully performed any act with the knowledge that the performance of that act was likely to result in injury to a passenger, or performed that act with reckless disregard of its probable consequences; * * * the mere violation of those (safety rules and regulations), * * * even if intentional, would not necessarily constitute wilful misconduct, but if the violation was intentional with knowledge that the violation was likely to cause injury to a passenger, then that would be wilful misconduct, and likewise, if it was done with a wanton and reckless disregard of the consequences.'
 
 
 30
 See also Koninklijke Luchtvaart Maatschappij N. V. KLM Royal Dutch Air-lines, Holland v. Tuller, 110 U.S.App.D.C. 282, 292 F.2d 775, 779-82 (D.C.Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961).
 
 
 31
 2. As stated by the trial court. After excerpting only parts of the charge upheld in Pekelis, supra, the court concluded that 'the Second Circuit does not' require knowledge that damage will probably result, 219 F.Supp. at 323, as is required by the Hague Protocol-- an amendment to the Convention which is not in force in the United States. Rather, the court indicated approval of a statement that wilful misconduct is 'carelessness without any regard for the consequences,' ibid. and stated that to establish wilful misconduct 'it is enough that he (the pilot) realizes, or from the facts which he knows, should realize that there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless.' Id. at 325-326.
 
 
 32
 B. Wilful misconduct in the plane's approach.
 
 
 33
 There is no justification for the conclusion that the only permissible inference from all the evidence was that the pilot had been guilty of wilful misconduct-- whether under Judge Ritter's standard or under that stated by the prior cases.
 
 
 34
 Defendants argue that a reasonable inference for the jury to have made was 'that the pilot from some inscrutable cause, became confused as to his actual position and commenced his let-down from a point he believed to be the proper one.' If that were so, wilful misconduct would not have been established under any standard. We cannot doubt that a jury could reasonably have thought it so on this record. The evidence shows that the pilot quite possibly thought he was making a proper landing-- in most respects he was, apart from location. There is evidence from which the jury could have inferred that the pilot would not have been likely to have tried to land without having received the requisite signals, thereby violating his clearance. The evidence also suggests that there may have been some radio communication trouble.
 
 
 35
 Against this, plaintiffs argue that, because of the technical and electronic characteristics of the indicators involved-- which they assert to have been operating properly-- the pilot could not have received all the signals which he was required by his clearance to receive before beginning his let-down. Because of this, they say, the pilot must have let down knowing that he had not received the proper signals, or with reckless disregard for whether or not he had. However, all these questions depend upon inferences to be drawn from essentially circumstantial evidence. Those who alone could provide direct evidence as to what in fact led the pilot to act are, unfortunately, not able to do so.[4] One can hardly imagine a clearer case in which such questions should have been left to the jury. See, e.g., LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 271 (2d Cir. 1965). We cannot even say that the pilot's or the airline's negligence was established as a matter of law, much less wilful misconduct. Once the case went to the jury, its verdict should not have been upset if reasonable men could find in defendant's favor, as they certainly could here. Markusen v. General Aniline & Film Corp., 16 F.R.D. 455 (S.D.N.Y.1954), aff'd on the opinion below, 221 F.2d 479 (2d Cir. 1955); see, e.g., Lavender v. Kurn, 327 U.S. 645, 652-653, 66 S.Ct. 740, 90 L.Ed. 916 (1946); O'Connor v. Pennsylvania R.R., 308 F.2d 911, 914 (2d Cir. 1962); 2B Barron & Holtzoff, Federal Practice & Procedure, 1075 at 378 (1961).
 
 
 36
 C. Wilful misconduct at headquarters.
 
 
 37
 Plaintiffs also urge that as a matter of law there was wilful misconduct at BCPA headquarters in the failure to instruct pilots as to a CAB letter interpreting clearance regulations concerning minimum altitudes in approaching San Francisco. Even if the letter itself were admissible, BCPA's conduct cannot be characterized as wilful misconduct; at best it was negligence arising out of an honest difference of opinion. However, this theory is not available to upset the jury's verdict. It was apparently not urged at trial and the jury was not charged about it. The trial judge made no ruling on it. The only semblance of support is a statement in Judge Ritter's 'Supplemental Opinion' that from BCPA's failure to excuse its non-production of certain documents it was permissible to infer that the failure was deliberate and that 'such documents would be unfavorable to defendant, BCPA, on such issue (wilful misconduct).' In particular, BCPA failed to produce a file relating to prescribed approach procedures, although an unspecified number of documents in that file were produced. Even if the nonproduction could establish that BCPA failed for some reason-- perhaps a justifiable one-- to tell pilots of the CAB interpretation, as we have said, that could not establish wilful misconduct as a matter of law under the theory of the case.
 
 
 38
 II. Collateral Estoppel.
 
 
 39
 Plaintiffs argue that defendant BCPA is collaterally estopped from relitigating the question of liability for 'wilful misconduct' because of a prior judgment against it in a case involving a different passenger killed in the same crash. Halmos v. British Commonwealth Pac. Airlines, Ltd., No. 34123, N.D.Cal. March 9, 1959. An action by Kapell's estate against BCPA and Qantas seeking $750,000 had been consolidated with Halmos. Prior to the first trial, summary judgment was granted in favor of Qantas, and the Kapell action against BCPA was dismissed on stipulation. After a jury in Halmos had returned a verdict for BCPA, Judge Ritter, sitting in California by designation, granted plaintiffs' motion for a new trial. After the second trial, also before Judge Ritter, a jury found for plaintiffs and assessed damages at $35,000 in contrast to $500,000 sought in the complaint. BCPA did not appeal. In 1954, when the Kapell action in California was begun, similar actions were also begun by Kapell's estate in the Supreme Court of the State of New South Wales, Australia, and in the Supreme Court of the State of New York. Service of a summons on the present defendants in the latter action was upheld in Berner v. United Airlines, Inc., 2 Misc.2d 260, 149 N.Y.S.2d 335 (Sup.Ct.), aff'd, 3 A.D.2d 9, 157 N.Y.S.2d 884 (1st Dept. 1956), aff'd 3 N.Y.2d 1003, 170 N.Y.S.2d 340, 147 N.E.2d 732 (1957). Thereafter in 1959 a complaint was served and the defendants had the action removed to the Southern District of New York.[5] It is this action that gave rise to these appeals.
 
 
 40
 Application of the doctrine of collateral estoppel raises many questions. Plaintiffs suggest that the lack of mutuality of estoppel (BCPA could not assert a judgment against Halmos as a bar to this action) need be no barrier here under our recent decision in Zdanok v. Glidden Co., 327 F.2d 944 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), 64 Colum.L.Rev. 1141. However, it is not altogether clear that Zdanok would govern the question of collateral estoppel in this case. Zdanok involved two federal court cases resting on federal question jurisdiction. We have two federal court cases here, but in both jurisdiction rests on diversity of citizenship. Therefore, in light of the radiations of Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), and Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947), we might properly look initially to New York law to determine what law governs. Under it the question of collateral estoppel would seem to be governed by New York local law. See Hinchey v. Sellers, 7 N.Y.2d 287, 295-296, 197 N.Y.S.2d 129, 133134, 165 N.E.2d 156, 160-161 (1959). Compare Peare v. Griggs, 8 N.Y.2d 44, 47, 201 N.Y.S.2d 326, 327, 167 N.E.2d 734, 735 (1960). But see Restatement (Second), Conflict of Lews 430a (Tent. Draft No. 10, 1964). New York does not permit other persons injured in an accident to avail themselves of a prior plaintiff's judgment. Elder v. New York & Pa. Motor Express, Inc., 284 N.Y. 350, 31 N.E.2d 188, 133 A.L.R. 176 (1940). Should New York look to California law, the result would seem to be the same in a multi-plaintiff accident case like this. See Nevarov v. Caldwell, 161 Cal.App.2d 762, 773-775, 327 P.2d 111, 119 (1958) (hearing denied by California Sup.Ct.); cf. Zdanok v. Glidden Co., supra, 327 F.2d at 955. But cf. Bernhard v. Bank of America, 19 Cal.2d 807, 122 P.2d 892 (1942); Teitelbaum Furs, Inc. v. Dominion Ins. Co., 58 Cal.2d 601, 25 Cal.Rptr. 559, 561, 375 P.2d 439, 441 (1962).
 
 
 41
 There are further questions. The collateral estoppel effect to be given to a prior federal court judgment in a subsequent action in either a federal or state court might itself be a matter of federal law. The same holds for the collateral estoppel effect to be given to a prior judgment-- federal or state-- in a subsequent federal court action. Here both the prior judgment and the subsequent actions are federal, although they are both, as noted, diversity actions. Thus, in United States v. United Airlines, Inc., 216 F.Supp. 709, 718-725 (E.D.Wash.1962), aff'd on the opinion below sub nom. United Airlines v. Weiner, 335 F.2d 379, 404 (9th Cir.), cert. dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964), the court determined as a matter of federal law that a prior federal court judgment in a diversity case was 'final' for the purposes of res judicata or collateral estoppel, cf. Lummus Co. v. Commonwealth Oil Ref. Co., 297 F.2d 80, 89-90 (2d Cir. 1961), cert. denied sub nom. Dawson v. Lummus Co., 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962); moreover, it indicated that the same federal rule would apply even if the first judgment was in a state court. Even so, the application of either res judicata or collateral estoppel was in fact determined as a matter of state law;[6] jurisdiction in both cases was based, to the extent here relevant, on diversity of citizenship.
 
 
 42
 A choice among these various routes need not be made. For even if this case might be subject to a federal rule including the elimination of mutuality (see Zdanok), the defendants here should not be confronted with the Zdanok rule. Abandonment of mutuality was there thought sound unless (1) assertion of the plea of estoppel in successive actions would create anomalous results, or (2) the party had not had a full and fair opportunity to litigate the issue effectively. As Halmos and this case seem to be the only actions by the estates of passengers involved in this accident, there is no probability of anomalous results. However, while not necessarily suggesting that BCPA did not have a 'full and fair opportunity to litigate' in Halmos, we think it would be unfair in this case to use the result of the second Halmos trial to the disadvantage of BCPA. At the conclusion of the second trial, Zdanok had not been decided. The result of the first trial was a victory for BCPA; of the second, a relatively small judgment. Had it sought still a third trial, it had to weigh victory against a much larger judgment. The failure to appeal for correction of whatever errors may have been made seems altogether reasonable and would very probably not have been the case if BCPA knew then that that judgment would govern the Kapell action in which far more-- $7,003,000-- was sought as damages.[7] In Zdanok, however, the first action was litigated as strenuously as would seem possible, see 327 F.2d at 946 n. 1, and the issues-- interpretation of a collective bargaining contract-- were not likely to be decided on the basis of a jury's choice among different factual inferences, as was the case here.
 
 
 43
 Even if the Zdanok approach were thought applicable to this prior judgment, mutuality should not so quickly be discarded in multiple accident cases like this. See 327 F.2d at 955. The rejection of mutuality in United States v. United Airlines, Inc., supra, 216 F.Supp. at 725-729, may be distinguished on the ground that the first judgment involved i4 of 31 pending actions; the gravity of the potential liability is shown by the fact that the ultimate judgments against the airline totalled $2,337,308. 216 F.Supp. at 730. Obviously, the airline would have exerted its full efforts with so much at stake. See note 5 supra. Moreover, the first judgment was being appealed, so that possible errors were not being overlooked. Although the first judgment was affirmed, a reversal would presumably have redounded to the benefit of the defendant in the second action, compare Maryland for Use of Levin v. United States, 381 U.S. 41, 53 n. 38, 85 S.Ct. 1293, 14 L.Ed.2d 205 (1965); consolidation of the actions on appeal eliminated much of the possible conflict.
 
 
 44
 Thus, whether the applicability of collateral estoppel is governed by federal, New York or California law, the result in this case would be the same; BCPA was free to relitigate the question of 'wilful misconduct.'
 
 
 45
 III. Conditional Grant of a New Trial on All Issues.
 
 
 46
 Defendants attack as an abuse of discretion Judge Ritter's decision conditionally ordering a new trial on all issues if his granting of judgment n.o.v. were reversed on appeal. We agree. We observe initially that our review of this issue is hampered somewhat by the fact that Judge Ritter gave no reason for granting a new trial. Plaintiffs had asserted several possible grounds in making the motion, but our study of the record reveals that the grounds relied upon must have been (1) that the verdict was against the weight of the evidence and (2) that defendants' counsel was guilty of prejudicial misconduct in his argument to the jury. Cf. Leighton v. One William St. Fund, Inc., 343 F.2d 565, 567 (2d Cir. 1965).
 
 
 47
 A. Verdict against the weight of the evidence.
 
 
 48
 We have already held that there was sufficient evidence to go to the jury either under the governing Second Circuit standard or under Judge Ritter's lesser standard of wilful misconduct. To order a new trial on the asserted ground when there was sufficient evidence to go to the jury need not be an abuse of discretion in every case, see 6 Moore, Federal Practice P59.08(5), at 3817, 3820 (2d ed. 1953), but we find that it was in this case. In light of the possible inferences as to what actually happened when the pilot began his let-down, we cannot agree that, viewed in light of the proper standard, the verdict could be called against the weight of the evidence. Cf. Damanti v. A/S Inger, 314 F.2d 395, 398 (2d Cir.), cert. denied sub nom. Daniels & Kennedy, Inc. v. A/S Inger, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963).
 
 
 49
 Nor can we accept plaintiffs' suggestion that the jury acted not on the evidence but out of prejudice and misunderstanding because it failed to award even the limited damages allowed under the Convention. It is true that defendants' counsel in his argument to the jury virtually conceded that their burden of proof on complete immunity had not been met. His statement, however, did not have sufficient formality or conclusiveness to be a judicial admission. See Rhoades, Inc. v. United Airlines, Inc., 340 F.2d 481, 484 (3d Cir. 1965); Note, Judicial Admissions, 64 Colum.L.Rev. 1121, 1132-33 (1964). Moreover, plaintiffs' counsel thereafter urged quite ardently that the jury should award all or nothing. The jury having adopted the latter suggestion, plaintiffs cannot now complain because their quite understandable strategy backfired.
 
 
 50
 B. Prejudicial statements.
 
 
 51
 Nor can we find anything in what defendants' counsel said to the jury to warrant awarding a new trial. With few exceptions-- none of which is substantial-- apparently no objection was made at the time to remarks now challenged as being so prejudicial. Thus, 'this challenge, raised for the first time on the motion for new trial, came too late.' Giffin v. Ensign, 234 F.2d 307, 316 (3d Cir. 1956); see Vareltzis v. Luckenbach S.S. Co., 153 F.Supp. 291 (S.D.N.Y.1957), aff'd 258 F.2d 78 (2d Cir. 1958).
 
 
 52
 In any case, the evidence here was almost entirely circumstantial. Any verdict would depend upon the inferences drawn from the known fragments, and most of what defendants' counsel did was to suggest certain inferences which could be drawn. In their memorandum to the trial court and on appeal, defendants have adequately shown that either they did not misstate the evidence or that any slight misstatements were not prejudicial. Misstatements of the law, if such there were, would not call for a new trial where the court's charge more than countered any such misstatements. Cf. A.B.C. Needlecraft Co. v. Dun & Bradstreet, Inc., 143 F.Supp. 686 (S.D.N.Y.1956), rev'd on other grounds, 245 F.2d 775 (2d Cir. 1957). Nor can we agree with the trial judge that plaintiffs' claim of misconduct constituted grounds for a new trial. See 'Appendix B,' 219 F.Supp. at 327-328.
 
 
 53
 IV. Defendants' Other Claims.
 
 
 54
 Because we reverse for the above reasons, we do not reach defendants' arguments as to the admissibility of various items of evidence, nor Qantas' argument as to its possible responsibilities for the liabilities of BCPA.
 
 
 55
 V. Plaintiffs' Appeal as to Pre-Judgment Interest.
 
 
 56
 We reverse both the granting of judgment n.o.v. and the conditional granting of a new trial, thus reinstating the jury's verdict in favor of defendants and setting aside the judgment entered upon the second jury's determination of damages; the question of pre-judgment interest is moot. Cf. Mertens v. Flying Tiger Line, Inc., 341 F.2d 851, 858 (2d Cir. 1965), petition for cert. filed, 33 U.S.L.Week 3376 (U.S. May 14, 1965) (No. 1168, 1964 Term; renumbered No. 142, 1965 Term). Consequently, we dismiss plaintiffs' appeal from Judge McLean's order denying interest.
 
 
 57
 Judgment reversed with instructions to enter judgment upon the jury's verdict in favor of defendants. Plaintiffs' appeal from the order denying pre-judgment interest is dismissed.
 
 
 
 [1]
 Convention and Additional Protocol with Other Powers Relating to International Air Transportation, October 12, 1929, art. 22, 49 Stat. 3000 (1934)
 
 
 [2]
 Id. at art. 25
 
 
 [3]
 Id. at art. 20
 
 
 [4]
 We do not mean to suggest that 'wilful misconduct' is an entirely subjective matter, see Prosser, Torts 189 (3d ed. 1964), but merely that we cannot know all the facts needed to make any kind of judgment, subjective or objective, as to what a man in the piloths position should have done. The fragmentary reconstruction that can be made permits inferences other than wilful misconduct. That is enough to let a jury's verdict stand
 
 
 [5]
 When the instant case came on for trial in the Southern District, it was assigned to Judge Ritter, then sitting here by designation. At the beginning of the trial, BCPA moved that he disqualify himself on the ground of personal prejudice against it, citing 28 U.S.C.A. 144 which provides that
 whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein * * *
 Judge Ritter declined to do so. Defendants then petitioned this court to grant prohibition or mandamus on the same ground. We stated that
 'while we do not necessarily endorse Judge Ritter's charge on wilful misconduct in the second trial in the Northern District of California in all respects, we perceive no basis in this or in other papers for concluding that the Judge would not charge the jury with respect to the Warsaw Convention in accordance with its language and applicable decisions of the Court. Pekelis v. Transcontinental & Western Air, 2 Cir., 187 F.2d 122, 23 A.L.R.2d 1349; Grey v. American Airlines, Inc., 2 Cir., 227 F.2d 282. Accordingly, we deny the application for prohibition or mandamus, thereby leaving it to Judge Ritter to determine whether or not, even though he is not in our judgment disqualified under 28 U.S.C. 144, he desires to proceed as the trial judge. (British Commonwealth Pac. Airlines, Ltd. v. Ritter, unreported, 2d Cir. 1961).
 Judge Ritter proceeded.
 
 
 [6]
 As a matter of state law, the court allowed plaintiffs to assert as an estoppel a judgment, then under appeal, for different plaintiffs against the same defendant in a federal district court action in California in which 24 actions involving passengers had been consolidated. As the second court noted, the first case 'was litigated to the hilt' and the defendant had affirmatively indicated that it had no new different or additional evidence. 216 F.Supp. at 728. The judgment in the first action as to liability was subsequently affirmed. 335 F.2d at 388-392
 
 
 [7]
 Had Zdanok been decided then defendants would still have been in a dilemma. On a third trial, it could suffer a judgment anywhere between zero and $500,000. The $35,000 judgment in hand would be quite attractive. Whether that judgment would be used against it would then depend upon where a subsequent action was brought and, if that court followed a Bernhard-Zdanok approach, whether the first action were found to have provided defendants a 'full and fair opportunity to litigate' the issues-- not the most certain or objective standard to apply in futuro. Here the instant case had already been
 
 
 [2]
 For the District Court's opinion see Southern District by the time Halmos II was decided. Had it not been, BCPA might reasonably have expected New York law to govern, under which there could be no estoppel. Of course, even more uncertainty would exist if the applicable statutes of limitations had not run, nor been tolled, and the subsequent action had not even been begun at the time of the first judgment